**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DONALD E. DONEFF,**

      **Plaintiff,**

                                                    **Civil Action 2:14-cv-313**
    **v.**                                               **Judge Michael H. Watson**
                                                   **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Donald E. Doneff, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 9). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff filed his applications for benefits in April 2011, alleging that he has been disabled since December 31, 2009, due to asthma, pancreatitis, and arthritis. (R. at 193-99, 200-05, 262.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Paul Gaughen

("ALJ") held a video hearing on December 11, 2012, at which Plaintiff, represented by counsel, appeared and testified. (R. at 41–52.) Sandra Steele, a vocational expert, also appeared and testified at the hearing. On December 21, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 14–27.) On February 4, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified that the highest level of education he obtained was the ninth grade. He stated that he stopped working as a construction laborer due to pain and numbness in his leg, which, he added, almost caused him to fall in a tank. Plaintiff said that he attempted to work part-time delivering pizza after filing his application, but was unable to continue to do so due to back pain. (R. at 41.)

Plaintiff testified that his back pain started in 2004 or 2005 and had worsened since then. (*Id.*) He said his pain felt like someone "sticking a knife" in him. (R. at 43.) He stated that he is in constant pain whether he sits or stands. (*Id.*) Plaintiff also described has leg and back pain as throbbing and burning. Plaintiff said that steroid injections helped relieve his neck pain for one-to-two weeks, but that he was afraid to get additional shots because he was afraid of contracting spinal meningitis. (R. at 44.) He added that he also treated his pain by doing exercises he learned in physical therapy and with heat and a TENS unit. (*Id.*) Plaintiff said that the TENS unit helps to control, but does not eliminate his pain. (R. at 45.) Plaintiff also testified that he

took pain medications, but that he stopped due to the side effects. He stated that he has attempted all of the treatments that his doctors have recommended.

Plaintiff estimated that he can stand between 45 minutes and an hour at a time and can sit for only 30 minutes at a time. (R. at 46.) He said that if he stands any longer, his leg will go numb and start burning, aching, and throbbing. Plaintiff also lies down for about 30 minutes about four times per day with a therapy ball under his lower back to relieve pain. (R. at 46-47.) He said he can only lift about 15 pounds. (R. at 47.)

During a typical day, Plaintiff is able to cook for himself and do his own laundry; he said he occasionally helps with dishes and doing half of the housework. (R. at 48.) Plaintiff testified that he now has difficulty running the sweeper, bending over, or standing for long periods to wash the dishes, so his girlfriend now handles those duties. (*Id.*) Plaintiff testified that she also mows the grass, but that when he has done it, he needs to take several breaks, with each break lasting 30 minutes. Plaintiff said that he can no longer enjoy his hobbies of hunting, fishing, and walking. He stated that his pain does not, however, impact his ability to use his hands and arms and does not prevent him from bathing, showering, and getting dressed.

**B.      Vocational Expert Testimony**

Sandra Steele testified as the vocational expert ("VE") at the administrative hearing. (R. at 52-58.) The VE testified that Plaintiff's past relevant work included a construction laborer, classified as heavy, semi-skilled work. (R. at 52-53.)

The ALJ proposed a series of hypotheticals regarding an individual of Plaintiff's age, education, work experience and with the residual functional capacity ("RFC") that he ultimately found for Plaintiff. The VE testified that such an individual could not perform Plaintiff's past

work. (R. at 53-55.) The individual could, however, perform representative occupations such as an assembler, with 4,800 jobs in the state of Ohio and 74,000 jobs in the national economy; packer/packager, with 6,000 jobs in the state of Ohio and 82,000 jobs nationally; and an inspector, with 1,900 jobs in the state of Ohio and 32,000 jobs in the national economy. (R. at 56.) The VE testified that all of these jobs still exist if the individual were further limited to light work and to only perfunctory and routine interaction with others. (R. at 56-57.)

On cross-examination, the VE testified that if the individual needed to the ability to lie down four times per day or at any time during an unscheduled break, it would be work-preclusive.

### III. MEDICAL RECORDS[1]

**A.    Muskingum Valley Health Centers (Primary Care Physicians)**

Plaintiff's medical records reflect that he presented with severe low-back pain in April 2004, when he was injured while digging a ditch and lifting large quantities of dirt. (R. at 320.) He was described to be in "marked distress." (*Id.*)

When seen by Jeffrey Williams, D.O., on June 8, 2009, Plaintiff complained of low-back pain. Dr. Williams noted that Plaintiff stated that he "felt a pop in his lower back" after jumping out of a truck. (R. at 333.) Dr. Williams noted tenderness on Plaintiff's left lumbar paraspinal muscles and that his sacral iliac area was not tender. Plaintiff had numbness in the L4, L5 dermatome of his left leg. His strength was 5 out of 5 and equal bilaterally. Dr. Williams

---

[1]In his Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to his alleged mental impairments. Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

assessed Plaintiff with low-back pain with left-leg neuropathy and instructed him to follow up after MRI results become available. (*Id*.)

An MRI of Plaintiff's lumbar spine taken on June 10, 2009, revealed mild diffuse lumbar spondylosis, diffuse disc degeneration, and mild posterior disc bulge throughout the lumbar spine, with suggestion of a conjoined left S1 nerve root. (R. at 328-29.)

In October 2009, Plaintiff reported to Dr. Williams that he continued to have low-back pain and a tingling an burning sensation. He indicated that the pain medications, Flexeril and Tramadol, were not helping. (R. at 331.) Dr. Williams assessed low-back pain and left-leg neuropathy.

A September 12, 2011 x-ray of the lumbar spine, ordered by Roger Ward, D.O., showed slight-to-moderate spondylosis. (R. at 323.) Plaintiff underwent an x-ray bone survey on September 20, 2011, which showed degenerative findings in his cervical spine. (R. at 378.)

In June 2012, Plaintiff saw Dr. Ward for medication refills. Plaintiff reported constipation from the medications. Dr. Ward noted a negative musculoskeletal examination. (R. at 735.) In September 2012, Plaintiff again reported the side effect of severe constipation. His physical examination was normal. (R. at 772-73.)

**B.     Muskingum County Department of Job & Family Services**

Plaintiff underwent an examination by Shelly Dunmayer, M.D., in June 2011. Dr. Dunmayer noted that Plaintiff's physical examination was mostly normal with slightly decreased range of motion in his hips, left knee, and dorsolumbar spine. Plaintiff had full strength in all areas and 4/5 strength in his left hip and knee muscles. Dr. Dunmayer opined that

Plaintiff was "limited physically by musculoskeletal issues" and that he had a "poor prognosis." (R. at 341-44.) She also described his health status as "deteriorating." (R. at 341.)

**C.      Michael Sayegh, M.D.**

Plaintiff first reported to Dr. Sayegh, a pain management specialist, on October 13, 2011. (R. at 425-26.) He complained of chronic pain in his neck, both arms, mid back, lower back and left leg. He described his pain as burning and throbbing. Plaintiff rated his pain severity at a level of 5-6 on a 0-10 visual analog scale. He reported that he had been experiencing his pain for years, since a work injury and personal injury. He stated that he had tried numerous nonsteroidal anti-inflammatory medications, as well as Percocet and Vicodin, but the medications were unsuccessful in treating his pain. He reported that the physical therapy he tried in 2009 exacerbated his pain. Plaintiff also reported failed home therapies, including exercise, rest, and walking, but added that these therapies helped while he was in physical therapy. He complained of numbness and tingling in bilateral upper extremities, with worse symptoms on his left side and burning pain in his left leg that eventually radiates to his right leg. Examination of Plaintiff's neck, and mid- and low-back area showed trigger points and tenderness bilaterally and in his paraspinal muscles. He tested mildly positive in his left-leg raising test. Neurological examination of Plaintiff's lower extremities revealed mild decreased sensation in the lateral aspect of his left lower leg. Dr. Sayegh diagnosed Plaintiff with: sprain/strain, sciatica, multiple herniated nucleus pulposus, multiple degenerative disc disease, and moderate spondylosis. With regards to Plaintiff's cervical area, Dr. Sayegh also diagnosed radiculopathy and moderate degenerative disc disease. Finally, in Plaintiff's thoracic area, Dr. Sayegh diagnosed thoracic

area: sprain/strain, radiculopathy, and herniated nucleus pulposus. Dr. Sayegh prescribed pain medication. (R. at 425-26.)

On November 11, 2011, Plaintiff presented to Dr. Sayegh with increased complaints of pain, rating his pain severity at a level of 7 on a 0-10 visual analog scale. (R. at 427.) Examination revealed trigger points and bilateral tenderness in Plaintiff's paraspinal muscles. A neurological examination showed mild decreased sensation in the lateral aspect of his left lower leg and a mildly positive left-leg raising test. Dr. Sayegh continued Plaintiff's pain medications. That same day, Dr. Sayegh opined that Plaintiff should be limited to part-time light duty or sedentary work. (R. at 421-22.) On this same form, he noted Plaintiff's diagnoses, his medical examination findings, that he had Plaintiff's MRI in his records, and that Plaintiff was responding "mildly favorably" to therapy. (*Id.*)

**D.     Genesis Pain Management: William Chang, M.D. /Gregory Siefert, M.D.**

Plaintiff was evaluated by Dr. Chang, a physical medicine and rehabilitation specialist, on January 16, 2012. (R. at 682.) Dr. Chang found tenderness at Plaintiff's T4-T6 spinous process, tight upper lumbar paraspinal muscle and left lower lumbar paraspinal muscles with mild muscle spasms, and decreased range of motion. (R. at 682-83.) He noted that bending movements elicited pain in Plaintiff's neck and also increased low-back pain with low-back flexion and extension movements. Dr. Chang diagnosed persistent lower-back pain; left lower-extremity radicular neuropathic pain due to left L1-L2 lumbar radiculopathy, secondary to foraminal stenosis and most likely a result of lumbar spondylosis; multilevel thoracolumbar disc degenerative disease; lumbar spondylosis; mid-back pain due to thoracic sprain and facet pain syndrome; and chronic pain disorder through central sensitization. (R. at 683.) Dr. Chang

7

prescribed pain medication and physical therapy. He further instructed Plaintiff to use a heating pad and to begin "short duration low-impact light aerobic exercise at least daily using exercise DVD designed for elderly people as a guide." (R. at 683.)

A January 25, 2012 MRI of Plaintiff's lumbar spine revealed a very small left paracentral disc bulge at L5-S1; slight decreased disc height at L4-5; and decreased disc water content at L2-3, L3-4, and L5-S1. (R. at 708.)

Plaintiff underwent an EMG/nerve conduction study on January 27, 2012. The conduction study revealed a denervation potential at the left anterior tibialis, which implies axonal damage at either peroneal nerve level or left L4-L5 nerve root level. The EMG also showed an absence of left tibial nerve H-reflex suggestive of left S1 radiculopathy. (R. at 687-89.)

On February 22, 2012, x-rays of Plaintiff's cervical spine showed degenerative disc disease at C4-C5, C5-C6 with posterior spondylosis. (R. at 705.) An MRI of Plaintiff's thoracic spine taken that same day showed degenerative disc disease and multilevel spondylosis. (R. at 706.)

In February 2012, a physical therapist observed and reported to Dr. Chang that Plaintiff had decreased range of motion, flexibility, and strength, as well as palpable tenderness in his mid-to-low back, impaired joint, and biomechanical dysfunction. (R. at 770.) When re-evaluated in May 2012, Plaintiff continued to show decreased muscular strength, back pain, palpable tenderness, and dysfunction. (R. 716-17.)

In March 2012, Dr. Chang reported that Plaintiff continues to experience persistent neuropathic pain at his left lower extremity and lower back. He noted that Plaintiff had been

compliant with his recommended treatment. Plaintiff rated his pain severity at a level of 9 on a 0-10 visual analog scale. He demonstrated increased low-back pain with low-back flexion, left bending, and extension movements. (R. at 722.) Dr. Chang assessed worsening left-lower extremity radicular neuropathic pain with clinical evidence suggesting of Left L1-L2 lumbar radiculpathy; persistent, chronic low-back pain with MRI evidence of multi-level thoracolmbar disc degererative disease and lumbar spondylosis; mid-back pain due to throacic sprain, facet pain syndrom, thoracic spine spondylosis, and disc degenerative disease; and chronic pain disorder through central sensitization. (*Id.*) Dr. Chang noted that Plaintiff's sensory deficit and weakness distribution were still consistent with T12, L1, and L2 distribution. He indicated that the thoracic MRI and x-ray of Plaintiff's cervical spine did not reveal any abnormality that could adequately explain his current symptoms. He therefore noted that a possibility of left upper lumbar plexopathy by pelvis mass needed to be considered. Dr. Chang further noted that Plaintiff's current narcotic pain medications combination (MS Contin and Duragesic patch) helped to reduce the pain intensity temporarily, but that neurontin produced no beneficial effect. (R. at 722-24.)

Plaintiff received epidural steroid injections by Gregory Siefert, M.D., in May and June 2012. (R. at 709-15.) When seen by the physician's assistant in September 2012, she found generalized tenderness over the lower lumbar region with limited range of motion secondary to pain. He exhibited normal motor strength and reflexes of his lower extremities with a slight decreased sensation over the left thigh compared to the right. (R. at 784.) Examination of Plaintiff's cervical spine revealed no tenderness over the right cervical facet joint with improved

9

range of motion. (R. at 785.) Plaintiff was scheduled for a repeat lumbar epidural steroid injection at L4-5 on the left. (*Id.*)

### E.    Bryan Bjornstad, M.D.

Plaintiff presented for a neurologic evaluation with Dr. Bjornstad, on referral from Dr. Chang in March 2012. Plaintiff reported severe pain in his middle lumbar region. He described the pain as a stabbing sensation which was exacerbated by standing on his feet for prolonged period of time. Pain was relieved with a TENS unit. He described his associated symptoms as constant burning and numbness on the anterior left thigh, present on a daily basis. He had a normal neurological examination except for decreased light touch sensation in his left thigh. Dr. Bjornstad diagnosed mild degenerative lumbar spine disease and left meralgia paresthetica. Dr. Bjornstad recommended a pain subspecialty consultation and advised Plaintiff to wear loose clothing. (R. at 733-34.) Plaintiff continued to see Dr. Bjornstad. (R. at 749-50.) On September 27, 2017, Dr. Bjornstad noted that with the recent cervical spine injections, fentanyl, and morphine, Plaintiff's symptoms had resolved. (R. at 776.) Dr. Bjornstad advised Plaintiff to gradually reduce his medication intake, to report back to his primary physician and pain specialist, and to return as needed. (*Id.*)

### F.    Jeffrey Lobel, M.D.

On Novermber 27, 2012, Plaintiff was evaluated by Dr. Lobel, a doctor who worked in the same practice as Dr. Bjornstad. He complained of back and leg pain that was exacerbated with activity. Dr. Lobel's examination findings were essentially normal. Because he had not failed all conservative treatment, Dr. Lobel declined to recommend surgical intervention.

Instead, he recommended that Plaintiff be evaluated for a spine stimulator and to continue to receive epidural steroid injections. He also recommended a repeated EMG study. (R. at 797.)

### G. State-Agency Evaluations

On July 13, 2011, state-agency physician Edmond Gardner, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. Dr. Gardner opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday. (R. at 67.) He further opined that Plaintiff could only occasionally stoop, kneel, crawl, crouch, and climb ladders, ropes, and scaffolds. (R. at 68.) Dr. Gardner also found that Plaintiff must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity and fumes, odors, dusts, etc. (R. at 68.) On January 17, 2012, Eli Perencevich, D.O., reviewed Plaintiff's records upon reconsideration and essentially affirmed Dr. Gardner's assessment. (R. at 95-97.) He found Plaintiff's statements regarding his physical allegations to be partially credible. He noted that the medical records showed that Plaintiff had some difficulties with range of motion, but that it was mild to moderate. (R. at 96.) Dr. Perencevich assigned Dr. Sayegh's opinion "other weight," stating that it was not clear that Plaintiff would be limited beyond light exertion. (R. at 96.)

### IV. ADMINISTRATIVE DECISION

On December 21, 2012, the ALJ issued his decision. (R. at 14–27.) He found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014. (R. at 19.) At step one of the sequential evaluation process, the ALJ found that Plaintiff had not

engaged in substantially gainful activity since his alleged onset date of December 31, 2009.[2] (*Id.*) The ALJ found that Plaintiff had the severe impairments of severe musculoskeletal impairment of the spine with some decreased sensation in the left lower extremity. (R. at 20.) He concluded that Plaintiff also had the non-severe impairments of oral health and alleged mouth cancer, depression, and anxiety disorders. (*Id.*) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> [Plaintiff] has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except [Plaintiff] requires some sit stand alternating option; can work on his feet for no more than six hours in an eight-hour workday and for up to two hours at one time; cannot operate foot controls with the left lower extremity; can occasionally operate foot controls with the right lower extremity; should not work around concentrated levels of irritants such as fumes or gasses; should not work in

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> temperature extremes; should not be assigned work at unprotected heights or in a dangerous industrial setting; and can learn and apply to work only new simple instructions and procedures having from two to four steps.

(*Id.*) In support of his RFC determination, the ALJ stated as follows: "This decision is supported by the opinions of the state agency medical consultants . . . ." (R. at 25.) The ALJ did not mention Dr. Sayegh's opinion that Plaintiff should be limited to part-time light or sedentary work.

With regards to his credibility determination, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (R. at 23.) In connection with this determination, the ALJ recounted Plaintiff's testimony, the medical examination and test findings, and his extensive treatment for back pain.

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy. (R. at 26.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff advances a number of challenges in his Statement of Errors, including challenges to the ALJ's step-two finding, his RFC determination, his credibility assessment, and his failure to appoint a medical expert to testify at the administrative hearing. The Undersigned

finds remand is warranted because the ALJ's RFC determination is not supported by substantial evidence.[3]

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the

---

[3]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the undersigned need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

> maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

As set forth above, in this case, the ALJ concluded that Plaintiff retained the physical RFC to perform medium work as contemplated in 20 C.F.R. § 404.1567(c), with additional limits on how much he could sit and stand at one time, limits on operation of foot controls, and some environmental limitations. The RFC contained no postural limitations on Plaintiff's ability to climb, stoop, kneel, or crawl. The regulations define medium work as follows:

> (c) Medium work. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567(c).

The ALJ provided almost no discussion as to how he arrived at Plaintiff's RFC determination. Rather, at noted above, he simply recounted some record evidence and stated that the decision was supported by the opinions of the state-agency medical consultants. But contrary to the ALJ's assertion, both state-agency medical consultants found that Plaintiff was limited to lifting just twenty pounds occasionally and ten pounds frequently, (R. at 67, 95-97), which is quite different than the occasional fifty-pound and frequently lifting/carrying twenty-five pounds that the ALJ contemplated under medium work. Moreover, consistent with the notations of Plaintiff's physicians that his pain increased with bending, flexion, and extension, both state-agency doctors concluded that Plaintiff had postural limitations on kneeling, crawling, crouching, and climbing ladders, ropes, and scaffolds. The ALJ, however, did not include any

16

such limitation in his RFC calculation. Notably, all of the opinions contained in the record are more restrictive than that the ALJ set forth in his RFC determination. Yet the ALJ failed to explain how the record evidence supported his conclusion that Plaintiff could perform medium work without any postural limitations.

The ALJ's lack of articulation prevents this Court from conducting meaningful review to determine whether substantial evidence supports his decision. *See Rogers* 486 F.3d at 248 (quoting *Hurst*, 753 F.2d at 519) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review."); *Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *4 (6th Cir. Apr. 1, 2011) (quoting 5 U.S.C. § 557(c)(3)(A)) (noting that an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'"). This Court must therefore remand this action for an explanation of the reasoning supporting the ALJ's RFC determinations. *See, e.g., Evans v. Comm'r of Soc. Sec.*, No. 1:10–cv–779, 2011 WL 6960619, at *14, 16 (S.D. Ohio Dec. 5, 2011) (Report and Recommendation), adopted, 2012 WL 27476 (S.D. Ohio Jan. 5, 2012) (remanding where the Court was "unable to discern from the ALJ's opinion how he arrived at the RFC decision and what evidence he relied on in making that decision," explaining that "[s]imply listing some of the medical and other evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the 'narrative discussion' requirement of SSR 96–8."); *Perkins v. Commissioner of Social Sec.*, No. 1:10-cv-233, 2011 WL 2457817, at *5–6, 9 (S.D. Ohio May 23, 2011) (Report and Recommendation), adopted, 2011

WL 2443950 (S.D. Ohio June 16, 2011) (same); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *8 (N.D. Ohio Apr. 4, 2012) (remanding where "the ALJ failed to properly articulate the RFC calculation," explaining that the Court was "unable to trace the path of the ALJ's reasoning"); *Commodore v. Astrue*, No. 10-295, 2011 WL 4856162, at *4, 6 (E.D. Ky. Oct. 13, 2011) (remanding action "with instructions to provide a more thorough written analysis," where the ALJ failed to articulate the reasons for his RFC findings such that the Court could not "conduct a meaningful review of whether substantial evidence supports the ALJ's decision").

To be clear, the Undersigned is not suggesting that SSR 96-8 requires a function-by-function analysis of Plaintiff's RFC.  Nor is the Undersigned suggesting that an ALJ is required to specifically reference every piece of evidence.  Rather, the Undersigned simply concludes that the ALJ's decision must provide some explanation of how the record evidence supports his RFC determination. *See* S.S.R. 96–8p, 1996 WL 374184, at *6–7; *Perkins*, 2011 WL 2457817, at *6 ("In rendering the RFC decision, it is incumbent upon the ALJ to give some indication of the specific evidence relied upon and the findings associated with the particular RFC limitations to enable this Court to perform a meaningful judicial review of that decision.  Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at her RFC determination.").

The Commissioner, in his Memorandum in Opposition, asserts that "[t]o the extent that this Court finds that the ALJ should have limited Plaintiff to light work, the ALJ's error is harmless."  (Def.'s Mem. in Opp. 10, ECF No. 11.)  The Commissioner explains that a harmless-error finding is warranted because the VE identified a significant number of jobs that Plaintiff

18

could perform at the light level. But this Court cannot simply formulate a different RFC that it finds is supported by substantial evidence. Instead, the Court must review the ALJ's RFC determination and rationale to determine if it is supported by substantial evidence. Regardless, even adopting the Commissioner's apparent proposal that the Court proceed from the understanding that the ALJ meant to adopt the state-agency medical consultants' findings does not alter this Court's conclusion given that the hypothetical posed to the VE did not contain any of the postural limitations that the state-agency medical consultants found.

### VII. CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

### VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  July 21, 2015                                           /s/ *Elizabeth A. Preston Deavers*
                                                                              Elizabeth A. Preston Deavers
                                                                              United States Magistrate Judge